UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.

FRANCISCO MOLINA

    Defendant.
_____/

CRIM. CASE NO. 12-20724

PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

### ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE SEIZED IN SEARCH WARRANT EXECUTION AT ASBURY PARK RESIDENCE ON OCTOBER 16, 2012

Background

On October 16, 2012, Federal agents executed a search warrant at the relevant Asbury Park residential address.

On December 11, 2012, Defendant Francisco Molina filed a motion to suppress all evidence seized at that search alleging that the search warrant violates the Fourth Amendment to the Constitution, and further that the defective warrant could not be saved under the Supreme Court ruling in *United States v. Leon*, 468 U.S. 897 (1984).

The Court held a hearing on this motion on February 12, 2012.

The Affidavit in Support of the Search Warrant

The search warrant affidavit states in ¶ 3 that the facts are based upon "observations" of law enforcement officers that establish probable cause to believe that the residence "contains

1

evidence of narcotics trafficking." To test this averment, the Court must drill down into the affidavit.

> ¶ 5 states that 2½ years ago, April 5, 2010, Reese, an arrestee in Willoughby, Ohio, whose car contained 18.5 lbs of marijuana stated that he picked up Defendant Francisco Molina at the Pittsburgh airport after he arrived from Brownsville, Texas; that Molina, the arrestee and a third person stayed at a hotel and collected funds to buy a large quantity of marijuana, whereupon Molina brokered a drug transaction in Flint, Michigan, and the three thereafter traveled back to Ohio where the marijuana was to be distributed.

> This paragraph, while extensive in detail, does not discuss the reliability or credibility of the arrestee.

> ¶ 6 states that in November 2010, about two years before the instant warrant execution, the affiant debriefed CI1 who was involved in a large scale drug trafficking organization operating from Mexico through Texas, and distribution points in Michigan and Ohio. That paragraph further stated that CI1 supplied marijuana to people in Ohio, and identified Molina's picture as someone who traveled from Ohio to Michigan accompanied by Reese (¶ 5) and a third person to buy large quantities of marijuana to distribute in Ohio. This information from a third person, CI1, establishes a second (See ¶ 5) fly-in, drive-through, pattern of marijuana distribution involving Defendant Molina.

> The paragraph, while extensive in detail, does not discuss the reliability or credibility of CI1.

> ¶ 7 This paragraph discusses the affiant's January 3, 2011 receipt of a Georgia prosecutor's records regarding the January 1998 arrest and conviction of Defendant Molina for a large quantity of cocaine and $42,000.

> The records detailed Molina's arrival in Atlanta on a flight from Houston, Texas, a distribution point for illegal drugs from Mexico, and the city from which Defendant Molina embarked to Detroit in the instant case.

> Although dated in time, this information further establishes Defendant's pattern of fly-in from Texas, drug distribution activities.

> ¶ 8 This paragraph discusses the January 19, 2012 debriefing of CS1 (not CI1). CS1 stated that he is engaged in trafficking large quantities of marijuana, and identified Defendant's picture as the facilitator and active participant in these drug transactions, and also corroborated the information in paragraph 5.

There is no mention of the reliability and/or credibility of CS1.

¶ 9 This paragraph indicates that on September 21, 2012, DEA Agents in Brownsville, Texas received authorization to conduct GPS location monitoring of a suspect cell phone, that on October 1, 2012 was first located at Bush International Airport in Houston, and later that day, had traveled to Detroit.

¶ 10 On October 9, 2012, GPS monitoring DEA Agents contacted this case's Homeland Security affiant, who then began local GPS monitoring and located the phone at the instant Asbury Park address.

¶ 11 Two days later, October 11, 2012, affiant and a second Homeland Security officer conducted surveillance at the Asbury Park address and "observed a high volume of foot traffic," and saw Molina exit the residence and enter a 2010 VW, plate #CCV765.

¶ 12 Affiant checked the Michigan State Registration Records and learned that the car was registered to a Freeland address in Detroit, that Keyuan Dewayne Gaston is associated with the Freeland address, and also associated with the Asbury Park address.

What "associated with means," is never explained; e.g. owns, rents, lives there, hangs out.

¶ 13 On October 15, 2012, affiant states that he reviewed a Detroit Federal Criminal complaint that indicted a large quantity of oxycodone [a different drug] was seized from a Robert Molina, [not Defendant, and not stated as related] on December 20, 2011 by Illinois State Police, and that Gaston (¶ 12) was arrested in the Detroit area for these drug related offenses.

¶ 14 states that on October 16, 2012, Federal Agents, Homeland Security and DEA initiated surveillance on the Asbury Park residence based on GPS data, and at 12:55 PM saw the VW car (¶ 11) parking there, and at 1:37 PM saw Defendant Molina and "two additional African-American men leave the house and enter the VW whose driver never exited the car or conversed with Molina or the other two."

¶ 15 states that the agents ordered a vehicle stop by Detroit Police Department Officers who identified the driver as James McCoy, the front passenger as Terrence Williams, and the rear passengers as Terrence Martin and Defendant. None of the occupants claimed ownership of the car. Officers searched the car and located "suspected marijuana seeds in center arm rest and front passenger floor board."

The Court notes that this affidavit deals primarily with marijuana.

¶ 16 states that the driver Martin told the officers at the traffic stop that he resided on Dequindre Street, from which he had immediately departed prior to the stop, which was contrary to what the officers had observed. Thus, officer surveillance had invalidated Martin's statement – and indeed Defendant Molina's statement in ¶ 17.

¶ 17 The officer determined that Defendant and Martin were subjects of outstanding arrest warrants, that Molina stated he had arrived in Detroit from Houston 1 week previous [GPS records, see ¶ 12 said the phone traveled from Houston to Detroit 15 days previous], that he was residing with Martin, and that "he had departed Martin's residence immediately prior to the traffic stop."

This statement about immediate departure from Martin's residence on Dequindre also conflicted with the agents observations, and indicates that Molina had lied about his presence at the Asbury Park residence where he had been seen, time and again.

¶ 18 states that front seat passenger Terrance Williams had been arrested 26 years previous, February 24, 1986, in New York for conspiracy to distribute heroin. Nothing was stated whether Williams was convicted.

¶ 19 states that criminal history records reflected that rear seat passenger Martin had been charged by the Detroit Police Department (DPD) in 2004 with (1) Carrying a Concealed [Weapon], and (2) Delivery of a Controlled Substance Less than 50 grams, and (3) Weapons Felony Firearm.

Also stated is that Martin had been arrested by the DPD for a weapons offense in 2005. Nothing was stated whether Martin was convicted of any offense.

¶ 20 states that based on GPS location tracking, affiant believes that Molina is currently residing on Asbury Park, which is in a high drug trafficking area.

Further stated is that GPS location monitoring indicated that subsequent to Molina's arrest, the cell phone was located at the intersection of 2 streets in Detroit. The affidavit does not state that this is where the vehicle stop occurred.

The Court will not be hyper technical, and will assume for purposes of its decision, that this GPS-monitored phone was in Molina's possession at the time of his street arrest.

The rest of ¶ 20 summarizes the affiant's belief, based on the investigation and the

GPS data, that Defendant Molina traveled to Detroit from Houston on October 1, 2012 to broker a large scale drug deal, and this travel is consistent with prior drug trafficking incidents.

Finally, ¶ 23 states that there is probable cause to believe that the Asbury Park single family residence will contain evidence related to violations of drug trafficking.

Analysis

In the instant case, the affidavit establishes that Defendant had flown up two weeks earlier from Texas, and had previously been involved in a fly-in from Texas to do a drug deal in the Michigan-Ohio area.

The Court concludes that the affidavit establishes that Defendant was likely staying at the Asbury Park house where he had been seen on multiple occasions, and where the affiant had seen a lot of foot traffic.

The stopped car contained marijuana seeds: marijuana was the drug involved in Defendant's previous fly-ins from Texas as noted in ¶'s 5&6.

This Court will base its decision on the "totality of the circumstances" approach adopted by the Supreme Court in *Illinois v. Gates*, 468 U.S. 213 (1983). A very recent Supreme Court decision reaffirmed this approach:

> We have rejected rigid rules, bright-line tests, and mechanistic inquiries in favor of a more flexible, all-thing-considered approach. In *Gates*, for example, we abandoned our old test for assessing the reliability of informants' tips because it had devolved into a "complex superstructure of evidentiary and analytical rules," any one of which, if not complied with, would derail a finding of probable cause. 462 U.S., at 235. We lamented the development of a list of "inflexible, independent requirements applicable in every case." *Id.* at 230, n.6. Probable cause, we emphasized, is "a fluid concept – turning on the assessment of probabilities in particular factual contexts – not readily, or even usefully, reduced to a neat set of legal rules." *Id.*, at 232

5

*Florida v. Harris* __U.S.__ 2013 WL 598440, at *5 (Feb. 19, 2013). *Harris* also sets forth that only a "fair probability" is required for probable cause. *Id.*, n.2. In the instant case, the Court concludes that the affidavit more than meets the fair probability requirement.

To reiterate, it is reasonable to assume that Defendant was staying at the Asbury Park single family house for a period of time during this recent trip to Detroit from Texas – whether or not it was his residence.

Because Defendant had a pattern of flying in from Texas to this area, and had been previously identified as a fly-in drug distribution expediter from Texas, there is more than a fair probability that this is what he was doing here at the Asbury Park address. The finding of marijuana seeds in the car with Defendant right after leaving the Asbury Park residence also supports the fair probability. The warrant issuing judge can infer that he was using the Asbury Park house to further his drug trafficking propensity. See *United States v. Williams*, 544 F.3d 683, 687 (6th Cir. 2008).

In the present case, Defendant was in and around the residence over a period of time. The Court recognizes that the Court's focus must be on whether there is probable cause as to the house, but the fact that there is probable cause to believe that Defendant is a Texas-based drug trafficker who is hanging out at the house is a fact that the Court cannot ignore. The Sixth Circuit held in *Williams*, that "an issuing judge may infer that a criminal suspect keeps the 'instrumentalities and fruits' of his crime in his residence." *Id.* at 688. There is sufficient substance in defendant's Texas/Ohio/Michigan travel history, his drug dealing history, the finding of marijuana seeds in the car, his presence at the house, and his false statement of where he just left, seeking to steer the officers away from the Asbury Park address, to sustain the

requirement of probable cause to search the Asbury Park residence.

Further, the Court concludes that even if there is not a fair probability that they would find evidence of narcotics trafficking at the Asbury residence, the pre-submission-to-the-Judge conduct by the affiant establishes that he gathered sufficient information from multiple sources, and corroborated the critical information through surveillance and GPS cell-phone tracking to support application of *United States v. Leon*, 468 U.S. 897 (1984), to deny the Motion to Suppress. In *Herring v. United States*, 129 S.Ct. 695 (2009), the Supreme Court, post-*Leon*, stated that exclusion of evidence is "our last resort." In *United States v. Master*, 614 F.3d 236, 242 (6th Cir. 2010), referring to *Herring*, the Sixth Circuit stated:

> [T]he Supreme Court has emphasized that the decision to exclude evidence is divorced from whether a Fourth Amendment violation occurred. The exclusionary rule's purpose is instead "to deter deliberate, reckless or grossly negligent conduct, or in some circumstances recurring or systemic negligence." *Herring* at 702.

The Court concludes that none of this type of improper conduct occurred here.

Accordingly, Defendant's Motion to Suppress is DENIED.

SO ORDERED.

DATE: 2-21-13

PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE